1    Straus & Boies, LLP
     David Boies, III
2    Timothy D. Battin
     Ian Otto
3    4041 University Drive
     Fairfax, VA 22030
4    Telephone: (703) 764-8700
     Facsimile: (703) 764-8704
5    tbattin@straus-boies.com

6    Donald F. Drummond (No. 052986)
     DRUMMOND & ASSOCIATES
7    One California Street, Suite 300
     San Francisco, CA 94111
8    Telephone:  (415) 433-2261
     Facsimile:  (415) 438-9819
9
     [other co-counsel appear at the end of document]
10
     Attorneys for Plaintiff Tracy Kinder on behalf of himself
11   and all others similarly situated

12

13              IN THE UNITED STATES DISTRICT COURT

14           FOR THE NORTHERN DISTRICT OF CALIFORNIA

15   TRACY KINDER, on behalf of himself and      )  Case No. C 05 3273
     all others similarly situated,              )
16                                               )     COMPLAINT
                         Plaintiff,              )
17                                               )     CLASS ACTION
            v.                                   )
18                                               )
     INTEL CORPORATION, a Delaware               )
19   corporation,                                )
                                                 )
20                       Defendant.              )
                                                 )
21

22          Plaintiff Tracy Kinder ("Plaintiff"), though his attorneys, on behalf of himself and

23   all others similarly situated in the State of West Virginia, brings this action against Intel

24   Corporation and its subsidiaries, including Intel Kabushiki Kaisha (collectively, "Intel")  for

25   damages and demands trial by jury, complaining and alleging upon information and belief as

26   follows:

27                             NATURE OF THE ACTION

28          1.      This case involves a scheme by Intel to illegally stifle and destroy

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

                                        1
                                                      COMPLAINT – CLASS ACTION

1   competition in order to maintain and extend its effective monopoly over microprocessors that run

2   the Microsoft Windows and Linux operating systems (the "x86 Microprocessor Market"),

3   leading to higher prices and less choice for consumers.  Intel, by using devices that create

4   essentially impenetrable barriers to competition such as:  (a) payments in return for exclusivity;

5   (b) discriminatory rebates, (c) discounts and subsidies conditioned on exclusive dealing

6   arrangements: (d) threats of economic retaliation against those who do business with anyone

7   other than Intel, or who cooperate with anyone other than Intel in the promotion of processors;

8   and/or (e) misuse of industry standards, has stifled competition and illegally leveraged its market

9   power to the detriment of consumers in West Virginia and nationwide.

10          2.      Intel dominates the x86 Microprocessor Market.   Intel sells approximately

11  80% of the microprocessors units sold worldwide, capturing 90% of the world revenue from

12  microprocessor sales.  For over a decade Intel has unlawfully maintained its monopoly by

13  engaging in a relentless, worldwide campaign to coerce customers to refrain from dealing with

14  anyone other than Intel – a campaign that has resulted in consumers of products containing

15  microprocessors (the heart of the computer) paying higher prices for x86 microprocessors and the

16  equipment of which they are a part than they would have paid had Intel not illegally sabotaged

17  competition in the relevant market.  In its efforts to illegally stifle competition in the

18  microprocessor market,  Intel has, inter alia:

19          A.      forced equipment manufacturers and other customers into

20  exclusive or near-exclusive deals;

21          B.      conditioned rebates, allowances and market development funding

22  on customers' agreement to limit it's purchases from competitors;

23          C.      established a system of discriminatory, retroactive, first-dollar

24  rebates that are available only when purchasers buy essentially all or all of their processors from

25  Intel;

26          D.      threatened retaliation against customers that introduce computer

27  platforms based on products other than Intel's, particularly where those platforms would be sold

28  in what Intel considers to be important market segments;

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

2

1           E.     established and enforced quotas among key retailers effectively

2    requiring them to stock almost exclusively Intel-powered computers, thereby artificially limiting

3    consumer choice;

4           F.     forced personal computer ("PC") makers and technology partners

5    to boycott competitive product launches and promotions; and

6           G.     abused its market power by forcing on the industry technical

7    standards and products that are designed to handicap competitors in the marketplace without

8    providing offsetting benefits to consumers.

9           3.     Intel's economic coercion extends to all levels of the computer industry –

10   from large computer-makers like Hewlett-Packard and IBM to small system-builders to

11   wholesale distributors to retailers such as Circuit City.  All must either accept conditions that

12   exclude Intel's competitors or suffer discriminatory pricing and competitively crippling

13   treatment.  In this way, Intel has avoided competition on the merits, depriving competitors of the

14   opportunity to compete against Intel based price and quality and depriving consumers throughout

15   the United States, including West Virginia, of the quality and price benefits of a competitive

16   market in microprocessors.

17          4.     Intel's conduct has caused computer manufacturers to continue to buy

18   most of their requirements from Intel, continue to pay monopoly prices, continue to be exposed

19   to Intel's economic coercion, and continue to submit to artificial limits Intel places on their

20   purchase from companies attempting to compete with Intel.  With the opportunity for Intel's

21   competitors to compete thus constrained, the cycle continues, and Intel's monopoly profits

22   continue to flow.

23          5.     West Virginia purchasers of computers and equipment with Intel x86

24   microprocessors such as Plaintiff, as with consumers in every state, ultimately pay the price, in

25   the form of inflated PC prices and the loss of freedom to purchase computer products that best fit

26   their needs and budget.  Consumers and the rest of society are worse off because in stifling

27   competition, Intel stifles the innovation provided by parties competing in a competitive market.

28          6.     The Japanese Government recognized these competitive harms when on

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

COMPLAINT – CLASS ACTION [Case No. 977325]

1  March 8, 2005, its Fair Trade Commission (the "JFTC") recommended that Intel be sanctioned

2  for its exclusionary misconducts directed at Advanced Micro Devices ("AMD"). Intel chose not

3  to contest the charges. The European Commission has also recently stepped up its investigation

4  of Intel's marketing practices.

5                          JURISDICTION AND VENUE

6          7.      The court has jurisdiction pursuant to 28 U.S.C. § 1332(d), in that this is a

7  class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of

8  interest and costs, and in which some members of the proposed class(es) are citizens of a state

9  different from Intel.

10         8.      Venue is proper pursuant to 28 U.S.C. § 1391(a) because Intel resides and

11  is subject to personal jurisdiction in this District and because a substantial part of the events or

12  omissions giving rise to the claims occurred in this District.

13                              THE PARTIES

14         9.      Tracey Kinder is a resident of West Virginia who has purchased a

15  computer with an Intel Pentium IV (x86 microprocessor) within the last 4 years.

16         10.     Defendant Intel Corporation is a Delaware corporation with its principal

17  executive offices at Santa Clara, California, and it conducts business both directly and through

18  wholly-owned and dominated subsidiaries worldwide and is registered to do business in this

19  state. Intel and its subsidiaries design, produce, and sell a wide variety of microprocessors, flash

20  memory devices, chipsets, memory, motherboards and silicon-based products for use in the

21  computer and communications industries worldwide.

22                      CLASS ACTION ALLEGATIONS

23         11.     Plaintiff brings this action under Federal Rule of Civil Procedure

24  23 (b) (3) on his own behalf and on behalf of the following Class:

25         12.     The Class is defined as:

26         All persons or entities present in West Virginia who indirectly purchased Intel x86
           Microprocessors or products containing Intel x86 Microprocessors manufactured
27         by Defendant from at least June 21, 2001 to the present. The Class of indirect
           purchasers of these products includes consumers and businesses that have
28         purchased Intel x86 Microprocessors and/or products containing Intel x86

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

4

COMPLAINT – CLASS ACTION [Case No. 977325]

1   Microprocessors.  Excluded from the class are all governmental entities,
    Defendant and its subsidiaries and affiliates.  The Class further excludes the judge
2   presiding over this matter and the judge's immediate family and staff.

3          13.    Although the exact size of the Class is unknown, the total number of class

4   members is in the tens of thousands, as all West Virginia consumers who have purchased

5   computers containing Intel x86 microprocessors are in the Class.  Based upon the nature of the

6   trade and commerce involved, the total number of Class members is such that joinder of the

7   claims of all Class members would be impracticable.

8          14.    Plaintiff's claims are typical of the claims of the Class in that Plaintiff

9   purchased computers containing Intel chips that are the subject of Intel's illegal attempts to

10  constrain trade in microprocessors.

11         15.    The following common questions of law or fact, among others, exist as to

12  the members of the Class:

13                A.     Whether Intel engaged in anticompetitive conduct that renders it

14  liable to the Class under West Virginia consumer protection and antitrust laws;

15                B.     Whether Intel has a dominant share of the relevant product and

16  geographic markets;

17                C.     Whether Intel possessed monopoly power in the relevant market;

18                D.     Whether there are substantial barriers to entry to the relevant

19  product market;

20                E.     Whether Intel has created artificial barriers to entry into the product

21  market;

22                F.     Whether Intel acquired or maintained power within the relevant

23  market through anticompetitive activity;

24                G.     The appropriate measure of the amount of damages suffered by the

25  Class;

26                H.     The appropriate nature of the class-wide relief;

27                I.     Whether Intel has created substantial barriers to competition in the

28  x86 Microprocessor Market; and

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

5

COMPLAINT – CLASS ACTION [Case No. 977325]

J.      Whether there are any substitutes for x86 Microprocessors reasonably available.

16.     These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

17.     After determination of the predominate and common issues identified above, if necessary or appropriate, the Class can be divided into logical and manageable subclasses.

18.     Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff has no relevant interests that are antagonistic to other members of the Class and has retained counsel competent and experienced in the prosecution of Class actions and antitrust litigation to represent himself and the Class.

19.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class members is impractical.  The damages suffered by individual Class members are relatively small, given the expense and burden if individual prosecution of the claims asserted in this litigation.  Thus, absent the availability of class action procedures, it would not be feasible for Class members to redress the wrongs done to them.  Even if the Class members could afford individual litigation, the court system could not.  Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system.  Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

20.     Intel has acted and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

21.     In the absence of a class action, Intel would be unjustly enriched because they would be able to treating the benefits and fruits of the wrongful conduct.

22.

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

6

COMPLAINT – CLASS ACTION [Case No. 977325]

INTEL'S MONOPOLY POWER IN THE RELEVANT MARKET
THE RELEVANT PRODUCT MARKET

23. The relevant product market is the x86 Microprocessor Market. A microprocessor is an integrated circuit that contains the entire central processing unit of a computer on a single chip.

24. Although other microprocessors are offered for sale, the non-x86 microprocessors are not reasonably interchangeable with x86 microprocessors because none can run the x86 Windows or Linux operating systems or the application software written for them.

25. A putative monopolist in this market can raise the prices of x86 microprocessors above a competitive level without losing so many customers to other microprocessors as to make this increase unprofitable. While existing end-users can theoretically shift to other operations system platforms, the costs associated with replacing existing hardware and software make this impractical. Further, the number of new, first-time users who could choose a different operating-system platform is too small to prevent an x86 microprocessor monopolist from imposing a meaningful price increase for a non-transitory period of time. Computer manufacturers would also encounter tremendous costs in switching from x86 processors to other architectures, and no major computer maker has ever done it. In short, demand is not cross-elastic between x86 microprocessors and other microprocessors at the competitive level.

THE RELEVANT GEOGRAPHIC MARKET

26. The relevant geographic market for x86 microprocessors is worldwide. A relevant geographic submarket is the United States. PC platform architecture is the same from country to country; microprocessors can easily and inexpensively shipped around the world, and frequently are; and the potential for arbitrage prevents chipmakers from pricing processors differently in one country than another. Further, the nature of the product and the market – as well as Intel's actions in seeking to corner the market to the greatest degree possible, means that consumers in West Virginia and other states are the real targets of the Defendant's actions and bear much of the burden of Intel's anticompetitive activities, even though its effects and the

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

7

COMPLAINT – CLASS ACTION [Case No. 977325]

1   nature of its scheme are hidden from them in the whole prices they pay for the product and in the

2   structure of Intel's system of rebating and engaging in cooperative advertising.

                INTEL'S MONOPOLY POWER IN THE RELEVANT MARKET

4           27.   Intel dominates the worldwide x86 Microprocessor Market.  According to

5   industry reports, over the past several years it has consistently achieved more than a 90% market

6   share as measured by revenue.   Intel has captured at least 80% of x86 microprocessor unit sales

7   in seven of the past eight years.

8           28.   The only party with more than a de minimus market share in the relevant

9   market is AMD.   AMD has consistently garnered about  9 of the revenue in the x86 market

10  while its worldwide volume share has stayed at about 15 percent.  Another competitor, National

11  Semiconductor, acquired Cyrix in 1997 and exited the market in 1998.  At the beginning of this

12  year only two other x86 chip makers remained – Via  Technologies, Inc. ("Via") and Transmeta

13  Corporation ("Transmetta").  Transmetta has announced its intention to stop selling x86

14  microprocessors, and Via faces dim prospects of growing its market share to a sustaining level in

15  light of Intel's anticompetitive activity.

16          29.   Intel is shielded from new competition by huge barriers to entry.  A chip

17  fabrication plant capable of efficiently mass-producing x86 microprocessors costs at least $2.5 to

18  $3.0 billion.  In addition, any new entrant would need the financial wherewithal to underwrite the

19  billions more in research and development costs to design a competing x86 microprocessor and

20  to overcome almost insurmountable intellectual property barriers.

21          30.   Annual worldwide consumption of x86 microprocessors currently stands

22  at just over 200 million units per year and is expected to grow by 50% over the balance of the

23  decade.  Most x86 microprocessors are used in desktop PCs and mobile PCs, with desktops

24  currently outnumbering mobile by a margin of three to one.  Of the total worldwide production of

25  computers powered by x86 microprocessors, 32% are sold to U.S. consumers.

26          31.   The majority of x86 microprocessors are sold to a handful of large original

27  equipment manufacturers ("OEM"), highly visible companies recognized throughout the world

28  as the leading computer makers.  The top nine OEM are regarded by the industry as "Tier One"

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

8

COMPLAINT – CLASS ACTION [Case No. 977325]

1   OEMs, which collectively account for almost 80% of servers and workstations (specialty high-

2   powered desktops), The Tier One OEMs are:  Hewlett-Packard ("HP"), which now also owns

3   Compaq Computer ("Compaq"); Dell, Inc.  ("Dell"); IBM, which as of May 1, 2005, sold its PC

4   (but not server) business to Lenovo,  a P.C. maker based in Bejing, New York and North

5   Carolina; Gateway/eMachines; and Fujitsu/Fujitsu Siemens ("Fujitus"), the latter a Europe-based

6   joint venture.  Toshiba, Acer, NEC and Sony are commonly viewed as Tier One OEMs in the

7   notebook segment of the PC Market.  HP and Dell are the dominant players in the worldwide

8   desktop and mobile sales, collectively accounting for over 30% of those markets, and almost

9   60% of worldwide server sales.  Both are U.S.-based companies, as is Gateway and Gateway /

10  eMachines; and all but Gateway have U.S. manufacturing operations (as does Sony, which

11  operates a North American production facility in San Diego).

12          32.     The balance of x86 production is sold to smaller system builders and to

13  independent distributors.  The latter, in turn, sell to smaller OEMs, regional computer

14  assemblers, value-added resellers and other distributors.

15          33.     OEMs sell their computers through a variety of distribution channels

16  including sales directly to customers through web-based e-commerce, sales though company-

17  employed sales force and sales through a network of independent distributors (who focus on

18  smaller business customers).  With the exception of Dell, which markets directly to consumers,

19  most OEMs also sell through retail chains.  Intel and its customers compete not only to have

20  OEMs incorporate their microprocessors into their PCs but also to convince retailers to allocate

21  shelf-space, so that the PCs containing their respective microprocessors can be purchased in the

22  retailers' store.

## INTEL'S ANTICOMPETITIVE PRACTICES

24          34.     When IBM defined the original PC standards in the early 1980's, it had

25  available a variety of microprocessors each with its own instruction set – among these were

26  microprocessors developed by Motorola, Zilog, National Semiconductor, Fairchild, Intel and

27  AMD.  IBM selected the Intel architecture, which utilized what became known as the x86

28  instruction set (after Intel's naming convention for its processors, i.e. 8086, 80186, 80286,

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

9

COMPLAINT – CLASS ACTION [Case No. 977325]

1   80386), and a compatible operating system offered by Microsoft, known as DOS.  Unwilling to

2   be consigned to a single supply source, IBM demanded that Intel contract with another integrated

3   circuit company and license it to manufacture x86 chips.  In 1982 to facilitate AMD's position as

4   a second source for x86 chips, the companies entered into the AMD – Intel Technology

5   Exchange Agreement (the "Agreement").   Intel soon thereafter set out to sabotage the

6   agreement.

7          35.    In 1984, Intel decided it would become the sole-source for the promising

8   80386 chip.  To fully realize its objective, Intel engaged in an elaborate and insidious scheme to

9   mislead AMD (and the public) into erroneously believing that AMD would be a second source

10  for supplying IBM with chips – at the time essentially the market, thereby keeping the

11  appearance of an alliance between AMD and Intel and keeping a veneer of competition for years.

12

13                      INTEL'S MONOPOLY IS THREATENED

14         36.    Intel's conduct gave it a significant head start over its competitors in the

15  x86 microprocessor market.  In 1999 AMD introduced the Athlon microprocessor, it marked the

16  first (but not the last) time Intel was technologically surpassed, and beat it to market with a new

17  generation Windows microprocessor.  AMD's Athlon chip was the first to break the 1GHz speed

18  barrier and outperformed Intel's Pentium III chips in tests.

19         37.    In April of 2003, AMD introduced its Opteron microprocessor, the world's

20  first 64-bit x86 microprocessor for servers.  Six months later, AMD launched the Athlon64, 64-

21  bit x86 microprocessor for desktops and mobile computers.  AMD's new microprocessors were

22  backward compatible, meaning they could accommodate 32-bit software as well as 64-bit

23  programs.

24         38.    Even though competitors were producing better microprocessors, at lower

25  prices, Intel has maintained its x86 microprocessor monopoly by deploying a host of financial

26  and other anticompetitive business strategies than in effect limit its customers' ability to deal

27  with competitors.  Intel continues to dominate the x86 microprocessor market through the use of

28  anticompetitive practices including (i) direct payments in return for exclusivity and near-

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

10

COMPLAINT – CLASS ACTION [Case No. 977325]

1   exclusivity; (ii) discriminatory rebates, discounts and subsidies conditioned on customer

2   "loyalty" that have the practical and intended effect of creating exclusive or near-excludes

3   dealing arrangements; (iii) threats of economic retaliations against those who refuse to limit their

4   business with competitors  to Intel-approved models, brands, lines and/or sectors, or would

5   cooperate too closely with competitors and (iv) misuse of industry standards setting processes so

6   as to disadvantage competitors in the market place.  As a result of these anticompetitive

7   practices, consumers pay inflated prices of x86 microprocessors and equipment contain them,

8   and have fewer competition choices for such microprocessors.

9           39.     Intel's anticompetitive misconduct is global.  It has targeted both U.S. and

10  foreign customers at all levels to prevent competitors from gaining market share, with the goal of

11  keeping competitors small and keeping Intel's customers dependent on Intel.  In this way, OEMs

12  remain vulnerable to continual threats of Intel retaliation, Intel's potential competitors remain

13  capacity-constrained, the OEMs remain Intel-dependent, and Intel thereby perpetuates its

14  economic hold over OEMs, allowing Intel to continue to demand that its customers curtail their

15  dealings with Intel's potential competitors.  And the cycle repeats itself:  by unlawfully

16  exploiting its existing market share, Intel impedes the competitive growth of its competitors and

17  increases and perpetuates the harm of potential customers and consumers.

18
                  INTEL'S ANTICOMPETIVE PRACTICES DIRECTED AT
19                       OEMS AND COMPETITORS DIRECTLY

20          40.     Currently, most of the major OEMs must deal with Intel.  First, the other

21  microprocessor manufacturers are too small to service all of an OEM's needs while continuing to

22  satisfy their existing customers demand.  Second, to meet customer expectations, OEMs must

23  assure commercial computer buyers that specifications, including the microprocessor, will

24  remain unchanged during the product's lifecycle.

25          41.     Intel has induced OEMs to enter into exclusive and near-exclusive deals,

26  thereby limiting its competitors' ability to gain incremental market share.  In addition, Intel has

27  engaged in activities which have effectively excluded competitors from the most profitable

28  product lines or from channels of distribution.  For example, Intel has largely foreclosed its

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

11

COMPLAINT – CLASS ACTION [Case No. 977325]

1    competitors from the lucrative commercial desktop sector.

2    41.    An April 5, 1999 article in *PC Week* describes the coercive effect of one such form of

3    payment, the "Intel Inside" program:

The wildly successful program, which began broadly in 1994 as a way to create brand equity for the Pentium processor, has evolved into Intel's premier marketing vehicle, managed by an army of attorneys, accountants and administrators. Intel (Nasdaq:INTC) has deftly used the program to keep competitors at bay in the most profitable segment of its business: corporate PCs. That, in turn, has left corporate buyers with fewer options—and higher prices—when choosing business desktops, notebooks and PC servers. A look at the Intel Inside program requirements, which Intel keeps under tight wraps, shows how fully the chip maker controls the marketing purse strings of PC makers that sign on. Interviews with numerous current and former executives at Intel's largest OEM customers – all of whom declined to be identified, fearing reprisals from Intel – add fuel to the fire. These executives call the program addictive and claim their companies can't compete without it…

The marketing dollars are enough of a carrot to make PC vendors sign off on Intel's restrictive program requirements. Before PC makers are eligible for reimbursement, they must sign an OEM Trademark License Agreement that regulates everything from logo size and color to branding. The eligible systems are added to a form called Attachment C, which Intel uses to keep track of qualifying Intel Inside products. OEMs must modify Attachment C every time they introduce a new Intel-based system. Once a PC maker meets all Attachment C guidelines, Intel reimburses 6 percent of the total average selling price of each vendor's worldwide microprocessor shipments. But Intel doesn't give the cash back to the PC makers to use as they wish; instead, it deposits the money into an Intel-managed market development fund, or MDF, which the vendors must use to pay for print, Web, broadcast or radio advertising of their Intel-based systems. If they don't use the funding within 12 months, they lose it…

If a vendor strays from Intel's guidelines – even for an infraction as minor as using the wrong size Intel logo on their packaging – Intel can freeze its eligible marketing funds. Since the funds come from the PC companies' chip payments, many customers believe Intel artificially inflates processor pricing to cover the costs. "They already have your extra money," said a veteran executive who retired last year from a top PC company. "They're charging you more money and then giving it back to you so you can advertise their products."…

In addition to its impact on pricing, the Intel Inside program also affects PC makers' product decisions. Although the guidelines don't prohibit use of non-Intel chips, they provide strong monetary disincentives to do so, several OEMs said. How strong? A licensee forfeits all MDF funding for a brand if it adds a non-Intel chip to the line. If it wishes to use another vendor's processor, it must establish and entirely new brand or sub-brand for that chip to retain funding for the existing brand. "There is no doubt that it's one of the major factors that influence [product] decisions," said a 20—year IBM PC executive who left the company in 1997. The source spoke from experience. In 1995, he said, IBM built several prototypes of low-cost retail and small office PCs based on Cyrix processors. But executives scrapped the plans, in part because they couldn't leave what the source described as a "substantial" amount of advertising money on the table. The branding restrictions go a long way toward explaining why none of the top 10 PC makers uses non-Intel chips in its business desktop lines.

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

12

COMPLAINT – CLASS ACTION [Case No. 977325]

42.     Intel has imposed on OEMs a system of first-dollar rebates that have the effect of creating exclusive or near-exclusive dealing arrangements and artificially foreclosing competitors from any meaningful share of the market.  In order to qualify for a rebate on any of its purchases, an OEM must first achieve a target level of purchases set by Intel.  Only upon an OEM's reaching this target will Intel retroactively provide a rebate.  Intel intentionally sets a rebate trigger level of purchases it knows to constitute a substantial percentage of a customer's needs.

43.     By setting its rebate targets as a significant percentage of the customer's requirements, Intel's rebate schemes are discriminatory and market-foreclosing.  If a customer chooses to purchase any significant quantity of microprocessors from an Intel competitor, it will not qualify for its rebate, thus raising the price it will pay on all Intel microprocessors it buys.  By tailoring targets to each customer's size and anticipated volume, Intel locks up significant percentages of the market much more effectively and at a lesser cost to itself – but to a greater harm to its competitors and ultimately consumers – as compared to offering such rebates for comparable purchase levels to all customers on a nondiscriminatory basis.

44.     Intel's rebate and other business strategies effectively cap the volumes of competitor-powered products than an OEM can buy and sell.  The use of retroactive rebates forecloses the possibility of a competitor inducing the OEM to launch a non-Intel powered platform.  Since OEMs incur substantial expense in designing and engineering a new computer, and make the investment only if they foresee a substantial chance of selling a sufficient volume to recoup it.  Intel's business strategies effectively foreclose the possibility of significant competitor-powered products from being developed and sold.

45.     Intel also uses product bundling in an exclusionary manner.  For example, in bidding for a new OEM platform, Intel bundles microprocessors with free or heavily discounted chipsets or motherboards.  Because some of Intel's competitors do not sell chipsets or motherboards, this product bundling enables Intel to avoid competing directly on microprocessor price and quality by imposing disproportionate burdens on Intel's competitors that are wholly unrelated to microprocessor product quality and price.

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

13

COMPLAINT – CLASS ACTION [Case No. 977325]

46.    In April 2003, Intel also disrupted AMD's launch of its Opteron server chip which was rolled out on April 22, 2003.  With few in attendance and little industry support, the Opteron server chip floundered in the market.  A computer industry journal reported Intel's fingerprints were all over the Opteron launch: "They all [vendors] told me that prior to the launch, they received a phone call from Intel.  Intel asked if they were going to the launch.  If they replied yes, then Intel rep asked them if it was 'important to them to go', or 'if they really wanted to go.'  Pressing the vendors, I got the same response, 'Intel is too smart to threaten us directly, but it was quite clear from that phone call that we would be risking our various kickback money if we went.'" (<http://theinquirer.net/?article=9139>.)

47.    Other companies that reported being intimidated from participating in the Opteron launch were MSI, Atipa, Solectron and Fujitsu-Siemens.  Indeed, Intel representatives told Fujitsu-Siemens' executives in the weeks preceding the Opteron launch that if they attended, they would be the only Tier One OEM showing its support, because all of the other OEMs had backed out.  With the exception of IBM, Intel was right.

48.    In March 2005, the Japan Fair Trade Commission ("JFTC") found that Intel's wholly-owned Japanese subsidiary, Intel Kabushiki Kaisha ("IJKK"), had violated Section 3 of Japan's Antimonopoly Act, explaining as follows:

> IJKK, since May 2002, has made the five major Japanese OEMs refrain from adopting competitors' CPUs for all of most of the PCs manufactured and sold by them or all of the PCs that belong to specific groups of PCS referred to as 'series', by making commitments to provide the five OEMs with rebates and/or certain funds referred to as 'MDF' (Market Development Fund) in order to maximize their MSS [the proportion of Intel microprocessors incorporated into an OEM's computers], respectively, on condition that:
> (a)    the Japanese OEMs make MMS at 100% and refrain from adopting competitors' CPUs
> (b)    the Japanese OEMs make MSS at 90%, and put the ratio of competitors' CPUs in the volume of CPUs to be incorporated into the PCs manufactured and sold by them down to 10%; or
> (c)    the Japanese OEMs refrain from adopting competitors' CPUs to be incorporated into PCs in more than one series with comparatively large amounts of production volume to others.

49.    According to the JFTC findings: "the ratio of the sales volume by AMD Japan and Transmeta USA among Total Domestic CPU Sales Volume decreased from approximately 24% in 2002 to approximately 11% in 2003.  By means of such conducts, IJKK

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

14

COMPLAINT – CLASS ACTION [Case No. 977325]

1  has substantially restrained the competition in the market of CPUs sold to the Japanese OEMs,

2  by acting to exclude its competitors' business activities related to the sales of CPUs to the five

3  OEMs." Intel has accepted the JFTC's recommendations and has chosen not to contest its

4  conclusions.

5  INTEL'S ANTICOMPETITIVE PRACTICES DIRECTED AT DISTRIBUTORS

6  50.    Intel employs tactics similar to those aimed at OEMs to prevent

7  distributors from carrying competitive products.  For example, it entered into an exclusive deal

8  with Synnex, which is one of the largest microprocessor distributors in the Unties States.  Given

9  Intel's substantial market share, there is no pro-competitive justification for the arrangement.

10  51.    As with OEMs, Intel offers discounts and rebates to distributors on the

11  condition that they no do business with competitors, either worldwide or in what Intel considers a

12  strategic sub-market.

13  52.    Intel also offers an array of programs to distributors in exchange for their

14  commitment to carry Intel microprocessors exclusively: marketing bonuses, increased rebates,

15  credit programs for new customers (credits that can be used for all products from Intel and any

16  other suppliers), payment for normal freight charges, and special inventory assistance such as

17  credits to offset inventory costs.

18  53.    Intel also offers retroactive rebates triggered when a distributor reaches a

19  prescribed buying quota.  Like the rebates offered to OEMs, the intent is to inflict economic

20  punishment on those who do too much business with Intel's competitors.  But, unlike OEMs,

21  distributors are unaware of the specific "goals" Intel has set for them or the precise consequence

22  of failing to meet them – Intel does not share this information with distributors; they simply

23  receive a check at the end of the quarter.  As a result, if distributors purchase any substantial

24  number of microprocessors from Intel's competitors, they put their Intel rebate money at risk.

25  ANTICOMPETITIVE PRACTICES DIRECTED AT RETAILERS

26  54.    Approximately twenty percent of desktop and notebook computers are

27  purchased at retail stores.  A few of retailers dominate the U.S. PC market: Best Buy and Circuit

28  City are the largest.  Other significant, but smaller retailers are Walmart/Sam's Club, Staples,

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

15

COMPLAINT – CLASS ACTION [Case No. 977325]

1  Office Depot and Office Max.

2         55.   A chipmaker faces a two-step process to get its platform on retail shelves:

3  first, it must convince one of more OEMs to build machines using its microprocessors at a

4  suggested price point (called "getting on the roadmap"); and second, it must convince the retailer

5  to stock and devote shelf space to these machines.  Shelf space comes at a premium.  The major

6  retailers demand market development funds ("MDF") in exchange for shelve space.  MDF can

7  consist of cooperative advertising support, but more frequently it comprises a marketing-related

8  opportunity that a chipmaker must buy for tens of thousands of dollars, for example, space in a

9  Sunday circular, an in-store display or an internet training opportunity with the chain's sales

10  staff.

11         56.   Intel's ability to pressure OEMs to produce a significant portion of their

12  product line with Intel microprocessor has naturally led to an overwhelming number of products

13  available at a retail level.  Also, it has significantly greater financial resources with which to buy

14  retail shelf space for products containing Intel microprocessors.  To leverage those advantages,

15  Intel has also made exclusive deals with many key retailers.

16         57.   To further limit competitors access to consumers, Intel instituted a rebate

17  program similar to what it foisted on OEMs, with a similar exclusionary effect.  Under this

18  program, Intel provides full MDF payments to retailers, such as Best Buy and Circuit City, only

19  if they agree to limit to 20 % not just the shelf space devoted to competitor based products, but

20  also the share of revenues they generate from selling competing platforms.  If a competitor's

21  share exceeds 20%, the offending retailer's marketing support from Intel is cut by 33% across all

22  Intel products.

23         58.   Intel's dealings with retailers are unlawfully exclusionary, have no pro-

24  competitive justification, and are intended to maintain its monopoly.

25         INTEL'S STANDARD SETTING AND OTHER TECHNICAL ABUSES

26         59.   Companies within the computer industry often agree to design certain

27  aspects of their products in accordance with industry standards to ensure broad compatibility.

28  Indeed, standards are not only ubiquitous in the computer industry, they are essential.  But when

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

16

COMPLAINT – CLASS ACTION [Case No. 977325]

1    a company is unfairly excluded from the standards-setting process or is denied timely access to

2    the standard, competition can be restrained in a way that reverberates throughout the entire

3    market. Intel has employed, and continues to employ, a variety of tactics that have the purpose

4    and effect of excluding and/or hampering competitors' full and active participation in the

5    development of important industry standards. It has also worked to deny competitors timely

6    access to such standards. Its efforts have hampered its competitors' ability to vigorously compete

7    in the market.

8             60.    Although industry organizations responsible for establishing standards

9    governing computer memory chips exist, such as the Joint Electronic Device Engineering

10   Council ("JEDEC"), Intel has convened a secret committee that it dubbed the Advanced DRAM

11   Technology ("ADT") Consortium to develop and promulgate competing memory standards.

12            61.    Arrangements such as this allow Intel to tighten its control over the

13   industry by converting what the component manufacturers intend as a public standard into a

14   proprietary one, and thereby guarantees itself an undeserved head-start and unfair competitive

15   advantage.

16            62.    Even where it has been unable to exclude competitors from participating in

17   the development of industry standards, Intel has attempted to drive the adoption of standards

18   having no substantial consumer benefit and whose sole purpose was to competitively

19   disadvantage competitors based on its highly integrated microprocessor architecture. For

20   example, Intel proposed that JEDEC modify a proposed industry standard for dual inline memory

21   modules, ("DIMMs") in a way that has no technical merit, but if adopted, would delay

22   competitors' ability to enter and compete in the market.

23            63.    Intel has also designed and marketed microprocessor-related products with

24   the goal of compromising performance for those who opt for competitors' products, even if it

25   requires Intel to sacrifice its own product quality and integrity. For example, Intel has designed

26   its compilers, which translate software programs into machine-readable language to degrade

27   performance when a program is run on an AMD platform. When software programs created with

28   Intel compilers detect an AMD microprocessor (i.e., when "CPUID," which identifies the

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

17

COMPLAINT – CLASS ACTION [Case No. 977325]

1    microprocessor is "Authentic AMD") they execute a code path that disrupts the program and can

2    cause the program to crash.

3           64.    Intel has not been content with simply locking up the microprocessor

4    market; through the use of their monopoly power in the microprocessor market they are seeking

5    to expand into chipsets, memory, and motherboard markets.

6           65.    In April 2002, Intel and Intergraph Corporation ("Intergraph")[1] entered

7    into a settlement agreement to end litigation filed by Intergraph in the United States District

8    Court for the Northern District of Alabama.  In that suit, Intergraph alleged that Intel had engaged

9    in anticompetitive behavior and infringed on Intergraph's patents. Specifically, Intergraph alleged

10   that Intel used its dominant market positions in the microprocessor market to coerce Intergraph

11   into giving up valuable patent rights. According to the Intergraph complaint, Intel again

12   employed its familiar coercive tactics: withholding essential design and defect information for

13   released Intel products and intentionally interfered with Intergraph's customers and suppliers.

14          66.    In the settlement agreement with Intergraph, Intel paid $300,000,000.00

15   for a license under the Intergraph Patents.  The license granted to Intel under the settlement

16   agreement expressly excludes a license to Intel's customers to combine licensed Intel products

17   with other third party chipsets or memory.  Thus a purchaser who purchases only a

18   microprocessor from Intel without a license to combine that microprocessor with a chipsets and

19   memory must either negotiate a license with Intergraph or infringe the Intergraph patent and run

20   the risk of a patent infringement lawsuit.  The end result would be that the only way to avoid the

21   patent issues would be to purchase not only the microprocessor, but also the chipsets, memory,

22   and motherboard from Intel.

23          67.    The settlement agreement also granted a license to Intel's customers which

24   use an Intel motherboard, so long as that motherboard contains exclusively Intel processing

25   elements.

26          68.    As a result, a purchaser of Intel's microprocessor can either (1) purchase

27   ────────────────────────

28   Intergraph is the world's largest company dedicated to supplying interactive computer graphics
     systems. Intergraph also makes and markets workstations for the engineering field.

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

18

COMPLAINT – CLASS ACTION [Case No. 977325]

1   the rest of its chipsets, motherboard, and memory from Intel, or (2) purchase a third party

2   chipsets, motherboard, and memory and face the possibility of a patent infringement lawsuit from

3   Intergraph, if they fail to enter into a license agreement with Intergraph.

4          69.    The above described settlement agreement allows Intel to effectively force

5   its customers, using its market power in the microprocessor market and under threat of suit from

6   Intergraph, to purchase not only Intel microprocessors, but also Intel chipsets, memory, and

7   motherboards.

8                          EFFECTS OF INTEL'S MISCONDUCT

9          70.    Were it not for Intel's acts, Intel's competitors would be able to compete

10  for microprocessor market on competitive merit, bringing customers and end-product consumers

11  such as Plaintiff, lower prices, enhanced innovation and greater freedom of choice.

12         71.    Intel's anticompetitive acts both inside and outside of the territorial

13  boundaries of the United States have a direct, substantial, and reasonable foreseeable effect on

14  trade and commerce and consumers, like Plaintiff, located in the state of West Virginia, as well

15  as consumers in other states.

16         72.    Intel's actions are also effectively hidden from those who are ultimately

17  affected most its actions: consumers.  Intel's rebate programs and the exclusivity of those rebate

18  programs are not publicly disclosed, nor are their effects – which together with their other

19  exclusionary practices, show up only in the predominance of Intel products in consumer

20  computer products.  As noted earlier, Intel relies on the uncertainty and fear created by its lack of

21  disclosure as to some of its rebate and incentive programs to create an interrorem effect among

22  distributors.  Further, even at the retail level, Intel's incentives, exclusive dealings, are, upon

23  information and  belief, largely kept from the public for fear that they would hurt Intel's image

24  with consumers and the ability to generate public good will in light of an image of buying off

25  retailers and distributors to avoid competition.

26

27

28

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

COMPLAINT – CLASS ACTION [Case No. 977325]

1                      IMPERMISSIBLE MARKET EFFECTS UNDER

2         73.     The contract, combination, and conspiracy alleged herein had the

3  following effects, among others:

4             A.     Competition between and among Defendant and their competitors

5  in the sale of x86 microprocessors was unreasonably restrained;

6             B.     Indirect purchasers of x86 microprocessors were deprived of the

7  benefits of free and open competition; and

8             C.     Prices paid by Plaintiff and other Class members for x86

9  microprocessors were fixed, raised, maintained, and stabilized at artificially high and

10  noncompetitive levels.

11         74.     As a result, Plaintiff and members of the Class have been injured in their

12  business and property in that they paid more for products containing x86 microprocessors than

13  they otherwise would have paid in the absence of Defendant's unlawful anticompetitive

14  practices.

15                             COUNT I

16          VIOLATION OF THE WEST VIRGINIA ANTITRUST

17            ACT: ILLEGAL RESTRAINT OF TRADE
       75.     Plaintiff incorporates herein by reference the allegations contained in

18  paragraphs 1-76 above.

19

20         76.     Beginning at least as early as July 11, 2001, and continuing to the present,

21  Intel and its distributors and OEMs, together with others, have  engaged in conduct constituting

22  contracts, combinations, and conspiracy in unreasonable restraint of trade and commerce in

23  violation of West Virginia Code § 47-18-103.

24         77.     The contract, combination, and conspiracy is continuing and will continue

25  unless the relief prayed for herein is granted.

26

27         78.     Plaintiff and Class members have been and will continue to be injured in

28  their business and property by Defendant's illegal contract, combination, and conspiracy.

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

COMPLAINT – CLASS ACTION [Case No. 977325]

79.     Pursuant to W. Va. Code. §47-18-109, Plaintiff demands treble damages and disgorgement from Defendant of all monies illegally acquired by it as a result of the unlawful conduct alleged herein as provided by law in West Virginia.

## COUNT II
## (VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT: ILLEGAL MONOPOLIZATION

80.     Plaintiff incorporates herein by reference the allegations contained in paragraphs 1-81 above.

81.     Beginning at least as early as July 11, 2001, and continuing to the present, Defendant's illegal, anticompetitive and deceptive actions as described in this Complaint constitute practices prohibited by West Virginia Code § 47-18-4.

82.     During the Class Period, Defendant directly or indirectly, and through affiliates they controlled, acted to illegally and deceptively to constrain and monopolize the market for x86 Microprocessor chips to be marketed and sold to consumers as part of products sold and distributed in West Virginia, and thus monopolize the consumer market for x86 microprocessors in West Virginia. These actions, designed to prevent consumers from having a choice and the benefits of competition and to hide the actions behind rebates and cooperative marketing programs, the full details of which were not fully disclosed even to the participants, restrained trade or commerce in West Virginia, and were designed to have, and did have, a substantial and adverse impact on choice, prices and quality of x86 microprocessors delivered and marketed to consumers in West Virginia. Thus, Intel's actions served to establish, maintain and/or use a monopoly or constituted an attempt to establish a monopoly of trade or commerce, a part of which is within West Virginia, for the purpose excluding competition and/or controlling, fixing or maintaining prices, as prohibited by W. Va. Code § 47-18-4.

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

COMPLAINT – CLASS ACTION [Case No. 977325]

83.    Intel's unlawful actions in monopolizing and attempting to monopolize and stifle competition and reduce consumer choice in the microprocessor market have  caused, and continue to cause, substantial injury and damage to Plaintiff, the Class – consumers of computer products containing x86 microprocessors in West Virginia – and the public.

84.    Plaintiff and Class members have been and will continue to be injured in their business and property by Defendant's illegal conduct.

85.    Pursuant to W. Va. Code §47-18-109, Plaintiff demands treble damages and disgorgement from Defendant of all monies illegally acquired by it as a result of the unlawful conduct alleged herein as provided by law in West Virginia.

COUNT III

UNJUST ENRICHMENT

86.    Plaintiff incorporates herein by reference the allegations contained in paragraphs 1-87 above.

87.    Defendant benefitted from its unlawful acts through the overpayment for x86 Microprocessors by Plaintiff and the Class.  It would be inequitable for Defendant to be permitted to retain the benefit of these overpayments, which were conferred by Plaintiff and the Class and retained by Defendant.

88.    Plaintiff and the Class are entitled to have Intel's excess and unjustly obtained profits properly allocable to West Virginia consumers disgorged by Intel and paid to the Plaintiff and the Class as damages or restitution.

JURY TRIAL

Plaintiff requests a trial by jury on all issues so triable.

RELIEF REQUESTED

WHEREFORE, Plaintiff prays for judgment against Defendant and respectfully

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

22

COMPLAINT – CLASS ACTION [Case No. 977325]

requests the Court:

1.      Certify this action to proceed as a class action pursuant to Rule 23, and direct that reasonable notice be given to members of the Class;

2.      Adjudge and decree that Defendant's conduct has violated W. Va. Code §§ 47-18-103 and 47-18-104, and that the Court award Plaintiff and the Class (i) actual damages in the amount to be proved at trial of the wrongful conduct alleged, trebled pursuant to West Virginia law, plus interest, and costs; and (ii) all other damages available under West Virginia statutory and common law, including attorneys fees;

3.      Find that the Defendant was unjustly enriched and that the Defendant should disgorge its unjustly obtained profits for the benefit of the Class;

4.      Award Plaintiff and the members of the Class the costs of this suit, including reasonable attorneys' fees;

5.      Award Plaintiff and the members of the Class pre-judgment and post-judgment interest on the above sums at the highest rate allowed by law; and

6.      Grant such other and further relief as this Court deems to be just and equitable.

Dated: August _10_, 2005

DRUMMOND & ASSOCIATES

By _____
      Donald F. Drummond
Attorneys for Plaintiff Tracy Kinder on behalf of himself and all others similarly situated

G:\drummondassoc\intel-class-action\compl-wv.wpd

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

23

COMPLAINT – CLASS ACTION [Case No. 977325]

1                                        Of Counsel

2    Kenneth G. Walsh                          Andrew S. Friedman
3    Straus & Boies, LLC                       Francis J. Balint, Jr.
     2 Depot Plaza, 2nd Floor                  Patrick J. Van Zanen
4    Bedford Hills, NY 10507                   Bonnett, Fairbourn, Friedman & Balint, P.C.
     Telephone: (914) 244-3200                 291 North Central Avenue, Suite 1000
5    Facsimile: (914) 244-3260                 Phoenix, AZ 85012
6    kwalsh@straus-boies.com                   Tel: (602) 274-1100
                                               Fax: (602) 274-1199
7                                              afriedman@bffb.com

8    Wyatt B. Durette, Jr.
9    Kenneth McArthur                          Jeffrey A. Bartos
     Durrettebradshaw, PLC                     Jonathan Rolfe
10   Main Street Center                        Guerrieri, Edmond, Clayman & Bartos, PC
     600 East Main Street                      1625 Massachusetts Avenue, NW
11   Twentieth Floor                           Washington, DC 20036
12   Richmond, VA 23219                        Tel: (202) 624-7400
     Tel:  (804) 775-6809
13   Fax: (804) 775-6911

14   Dennis Stewart
15   Hulett Harper Stewart, LLP
     550 West C Street, Suite 1600
16   San Diego, CA 92101
     Tel: (619) 338-1133
17

18

19

20

21

22

23

24

25

26

27

28

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

24

COMPLAINT – CLASS ACTION [Case No. 977325]